UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMIE L. CENATIEMPO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11-CV-923 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On May 1, 2008, plaintiff Jamie Lynn Cenatiempo filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of August 28, 2007. (Tr. 109-10).[1] After plaintiff's application was denied on initial consideration (Tr. 59-65), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 68).

Plaintiff and counsel appeared for a hearing on October 14, 2009. (Tr. 1-45). The ALJ issued a decision denying plaintiff's claims on November 20, 2009 (Tr. 50-58), and the Appeals Council denied plaintiff's request for review on March 17, 2011. (Tr. 46-49). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II. Evidence Before the ALJ

#### A. Disability Application Documents

---

[1]Plaintiff subsequently amended her onset date to October 31, 2007. (Tr. 123).

In her Disability Report (Tr. 127-39), plaintiff listed her disabling condition as endometriosis that caused severe pain, especially in her abdomen and back, and for which she had undergone several surgical procedures. The pain came in waves and prevented her from moving. She also experienced migraine headaches with blurred vision, nausea and vomiting. Her pain medications made her tired and impaired her memory and ability to concentrate. She was unable to drive when taking the medications. Her conditions occasionally made it very difficult for her to sit or stand and she experienced extreme fatigue. She also had unspecified bowel problems. The migraines made her sensitive to light and sound. Constant pain prevented her from working. Plaintiff's medications included Ibuprofen, Oxycodone, Darvon and Naproxen for pain, and Imitrex for migraines. (Tr. 136).

In her Function Report (Tr. 154-63), plaintiff stated that she showered when she woke up in the morning and then lay back down for a half-hour. She dressed her young daughter and accompanied her husband as he drove their daughter to school. On returning home, plaintiff lay down for another hour, after which she did a load of laundry and ate lunch. She then took a two-hour nap. She talked with her husband while he got ready to go to work on the evening shift. She ate dinner and took a bath; she then put her daughter in the bathtub while she lay on the floor beside the tub. She put her daughter to bed and then went to bed herself. She indicated that she was able to do laundry and wash dishes with assistance, make beds, and vacuum or sweep for five minutes at a time. Her husband drove her to do shopping twice a month. She could no longer cook meals and relied on simple prepared foods. When she had migraines she was not capable of doing more than watching television and lying on the couch. On days when she took medication, she was unable to drive. Otherwise, she

drove herself to medical appointments and took her daughter to school. Her medication made her forget things very easily and she had a hard time completing anything other than routine tasks. She stated that she was very irritable and often did not talk or respond to others. Her additional medications included Nortriptyline and Maxalt - MLT.

Plaintiff had previously worked for a credit card company as an account coordinator, customer service agent, team leader, and project manager. She did similar work at a photo business and a rental car company. (Tr. 140).

### B. Hearing on October 14, 2009[2]

At the time of the first hearing, plaintiff was 31 years old. She lived with her husband and two children, ages 5 years old and 8 months old. Plaintiff left high school in the 12th grade and completed a GED. She had completed one year of college. (Tr. 8-9).

Plaintiff testified that she had applied for unemployment benefits after her disability application was denied on initial review. (Tr. 12). In addition to the jobs described in her application, plaintiff had also worked as a telemarketer, a cashier, a teacher in a daycare center, and drive-thru attendant at a fast-food restaurant. (Tr. 17-22).

Plaintiff testified that, since 2001, she has had 10 to 15 surgical procedures to address her endometriosis. (Tr. 24). She testified that she has severe pelvic pain and cannot sit or stand for very long and has to lie on one side or the other to obtain any relief. Her pain medications included two Percocet tablets every four hours, one Tramadol tablet three times a day, and Tylenol and Motrin. (Tr. 25). She first had

---

[2]Tr. 1-45.

migraines as a child but they had been infrequent when she was younger. In the three years preceding the hearing, she suffered light- and sound-sensitive migraines two or three times a week. During a migraine she had to lie in a completely dark room and take medication. (Tr. 25). She missed two weeks of work out of every month due to migraines. (Tr. 26). She had recently been diagnosed with fibromyalgia, which caused morning stiffness in her joints and made it hard for her to grasp things. (Tr. 32). She had incontinence of the bowel and bladder following a hysterectomy in June 2009. (Tr. 27). She testified that the Perocet made her feel dizzy and disoriented, the Midrin she took for migraines knocked her out completely, and the Tramadol made her "see things . . that really aren't there sometimes." (Tr. 28).

Plaintiff testified that she was fired in October 2007 because she missed too much work due to her medical conditions. Since that time, her pain steadily worsened and she no longer drove, cooked, or did any of the household chores she listed in her initial function report. (Tr. 30). She also did not care for her children during the day -- her daughter was in school and her sister took care of her infant son. (Tr. 31). Plaintiff testified that she was able to stand for approximately 20 minutes, sit for approximately 30 minutes, walk for about 5 or 10 minutes, and lift about 15 pounds. (Tr. 31-32). She spent six hours a day lying down.

Plaintiff testified that before her hysterectomy her pain was at a level 10 on a 10-point scale. Following the surgery, she felt much improved for about two weeks but the pain had slowly returned and was at a level 8 or 9. (Tr. 34). She was not in pain during the hearing, which she attributed to the Percocet she had taken that morning. She explained that the endometriosis was "attached to" her bowel and intestine. It was too risky to surgically remove it, so the tissue will remain in place but will no

longer grow as a result of the hysterectomy. Her treatment will focus on pain management. (Tr. 35-36). She planned to see a gastroenterologist to discuss options for treating the diarrhea and bowel incontinence, including surgery.

Delores Gonzalez, M.Ed., a vocational expert, testified about the employment opportunities for an individual with plaintiff's education, training and work experience, with the ability to perform medium work without further limitation. She opined that such an individual would be able to perform plaintiff's past relevant work.[3] She was next asked to assume that the individual required a sit-stand option with the ability to change position frequently. Ms. Gonzalez opined that such an individual would be precluded from performing work as a data entry clerk, daycare worker, sales clerk, and some fast food positions, but would be able to perform the duties of the drive-through window position plaintiff previously held. (Tr. 41). In the next hypothetical, the ALJ asked Ms. Gonzalez to assume that the individual would have at least three absences per month due to pain plus headaches that would take her off-task for two hours at a time without warning. She testified that such an individual would be unable to maintain employment. (Tr. 43).

## C. Medical Evidence

Plaintiff has an extensive history of abdominal surgical procedures, starting with an appendectomy and laparoscopy for treatment of endometriosis and endometrioma in January 2005. See Tr. 215 (stating history). It appears that plaintiff began receiving treatment with Lupron in mid-2005. (Tr. 264). In August 2005, she reported

---

[3]Ms. Gonzalez described plaintiff's past work as: account coordinator, customer service agent, "lead trainer," project manager, team leader, fast food worker, retail sales clerk, daycare worker, telemarketer, and data entry clerk. These were classified as sedentary and light duty, and unskilled, semiskilled, and skilled positions. (Tr. 39-40).

to her obstetrician and gynecologist, Frederick Durer, M.D., that she was "doing very well from a pain standpoint [and] would not change anything for now." Id.

Plaintiff's primary care physician, Thomas Sommers, M.D., provided routine treatment to plaintiff throughout 2005 for relatively minor complaints (e.g., a twisted knee on 2/16/05; a rash on 5/25/05; enlarged tonsils on 6/24/05; cough on 8/15/05) (Tr. 304-13). A note dated February 24, 2006, informed Dr. Sommers that plaintiff was receiving psychotherapy for treatment of panic disorder. (Tr. 314).

On March 12, 2006, plaintiff was seen in the emergency department at St. Luke's Hospital with complaints of abdominal pain with nausea. She described the pain as "fiery" and rated it as level 9 on a 10-point scale. (Tr. 315-16). She had marked tenderness on palpation of the back. The clinical impression was ovarian cyst. She followed up with Dr. Durer on March 13, 2006. (Tr. 263). She was in severe pain, and a CT scan showed a complex mass on the left side of approximately 4 to 6 centimeters. Plaintiff underwent a laparoscopic removal of her left ovary and adhesiolysis on March 17, 2006. See Tr. 298 (St. Luke's Hosp. pathology report). Dr. Durer noted that plaintiff had a lot of pelvic scar tissue. See Tr. 215-21 (Dr. Durer's review of surgical history).

On June 21, 2006, plaintiff reported to Dr. Durer that she was trying to conceive. (Tr. 265). On August 25, 2006, Dr. Durer noted that plaintiff had left-sided back pain. She was already taking Darvocet; he added Ultram and Cymbalta. The following day, plaintiff reported that the Darvocet helped with the pain but that she could not work when taking it. (Tr. 269). A note dated September 1, 2006, indicates that an ultrasound disclosed an endometrioma. (Tr. 270). Dr. Durer performed a laparotomy on September 7, 2006. (Tr. 215-21). He noted that plaintiff had

experienced some pain relief following surgery six months earlier but that she now had a mass on her right side. He hoped to preserve her right ovary as she was trying to conceive. In the course of the procedure, Dr. Durer noted that plaintiff's omentum, small bowel, and uterus were adhered to her right ovary. (Tr. 217).

Following surgery, plaintiff reported some improvement in her pain levels. She was treated with depo-Lupron. (Tr. 270, 265). However, in November 2006, she began to complain of pain on her left side. (Tr. 271). She also had an unexplained weight loss of about 20 pounds in a six-month period. Compare Tr. 317 and 141. She had not been trying to lose weight, but had no appetite. In addition, she told Dr. Sommers that she felt "like she [was] always shaking, and was fatigued and wanting to sleep." She reported some episodes of diarrhea. (Tr. 318). She was diagnosed with Graves Disease. See Tr. 223-24 (2008 history noting diagnosis of Graves Disease in 2006).

The next medical entry relevant to plaintiff's alleged impairments occurred on September 17, 2007, when Dr. Durer noted that plaintiff was in her third week of menstrual bleeding. (Tr. 277). On September 26, 2007, plaintiff told Dr. Sommers that she was trying to conceive and not taking medications. Although her mood was good, she reported that she was tired all the time. (Tr. 345). On January 31, 2008, plaintiff requested pain medication for treatment of pelvic pain and stated that she was about to go on a cruise. (Tr. 282).

On March 29, 2008, plaintiff sought treatment at the Progress West emergency room for pain in her left side. (Tr. 189-211). She was treated with IV pain medication and then discharged with Percocet. (Tr. 223). On March 31, 2008, she was admitted to St. Luke's Hospital for pain control. (Tr. 223-24). An ultrasound showed that she

had an endometrioma of about 3.5 cm; an ultrasound performed at the end of February 2008 had shown the mass to be 1.9 cm.

On April 3, 2008, Dr. Durer performed another laparoscopic procedure, with adhesiolysis and drainage and excision of endometriosis. (Tr. 225-27). He noted dense adhesions of the bowel and uterus and in the right ovary. At a post-operative visit on April 8, 2008, plaintiff reported that she was experiencing a light- and sound-sensitive headache with abdominal pain, vomiting and dehydration. Dr. Durer readmitted her to St. Luke's Hospital for observation to make sure she had not sustained a bowel injury during surgery. (Tr. 285, 489, 245).

On May 6, 2008, plaintiff reported to Dr. Sommers that she had been having 2 to 3 migraines a week since the surgery in April. (Tr. 349-50). She stated that they caused her the worst pain she had ever felt and rated them at 10 on a 10-point scale. Dr. Sommers noted that the headaches started when plaintiff began taking Clomid, a fertility treatment, but that she was reluctant to stop the medication. She received a prescription for Percocet on June 11, 2008. (Tr. 471). On June 23, 2008, plaintiff reported that she had had abdominal pain and nausea for two days; she could not stand upright and the pain woke her up at night. (Tr. 357). An ultrasound of the gall bladder and pelvis was unremarkable. (Tr. 465, 473, 488). However, on July 3, 2008, a gynecological ultrasound showed multiple cysts. (Tr. 471). On July 7, 2008, plaintiff learned she was pregnant. Id. On July 28, 2008, plaintiff was admitted to the hospital with hyperemesis. (Tr. 420, 370).

Plaintiff continued to complain of headaches, back pain, and gastrointestinal distress. See Tr. 475 (office visit to Dr. Durer on 9/22/08); 454 (treatment at St. Luke's Hosp. for nausea, vomiting, diarrhea, fever and chills); 467 (headache with

blurred vision; noted urinary tract infection throughout pregnancy). In December 2008, she fractured her foot while exiting her vehicle. (Tr. 372). On January 14, 2009, plaintiff went to the emergency room at Progress West, seeking treatment for a migraine that had lasted a week and which Percocet did not relieve. (Tr. 506-16). On January 19, 2009, plaintiff reported that she was experiencing bowel incontinence. (Tr. 468). She received inpatient treatment at St. Luke's Hospital for abdominal pain and possible pyelonephritis between February 4th and February 6th, 2009. (Tr. 497).

Plaintiff was again admitted to St. Luke's Hospital with severe abdominal pain on February 16, 2009. James A. Bartelsmeyer, M.D., completed a consultation on February 19, 2009. (Tr. 406-09). He noted that plaintiff obtained relief only from morphine delivered intravenously and opined that her pain was probably secondary to scarring. Plaintiff's son was delivered on February 20, 2009. (Tr. 404).

On May 6, 2009, plaintiff received a prescription for Percocet to treat pain associated with endometriosis. (Tr. 478). On June 19, 2009, Dr. Sommers noted that plaintiff was experiencing chronic headaches and poor sleep. She reportedly gagged in her sleep. She had chronic pain and aching in her joints in addition to pain due to endometriosis. Plaintiff told Dr. Sommers that Dr. Durer wondered if she had fibromyalgia. She was taking Cymbalta for treatment of depression. (Tr. 377).

Plaintiff was admitted to St. Luke's Hospital on June 22, 2009, with severe pain. (Tr. 390-94). An ultrasound showed likely endometrioma and a possible hemorrhagic cyst. She required pain medication and obtained relief only with a morphine pump. Dr. Durer scheduled plaintiff to undergo a hysterectomy on June 30, 2009, but noted that the procedure might be difficult due to endometriosis and scar tissue. He was

very worried about her post-surgical pain control. Risks of the surgery included injury to the bowel and bladder.

The surgery was performed on July 1, 2009. (Tr. 492-94). Dr. Durer performed a hysterectomy and adhesiolysis and removed plaintiff's right ovary. She had a right ovarian cyst, adhesions to the uterus, and a hemorrhagic peritoneal cyst stuck to her small bowel and uterus. She was readmitted to St. Luke's Hospital on July 11, 2009. (Tr. 382). She reported that she had been experiencing much less pain until that morning, when her pain was at level 9 on a 10-point scale. She felt cold and shaky and had vomited in the shower that morning. She still felt nauseated. She had been experiencing diarrhea following the surgery. On examination, she was visibly shaking and there was a definite pelvic mass and tenderness. She was admitted for treatment with intravenous antibiotics of a probable pelvic hematoma. At follow-up on August 5, 2009, plaintiff reported that she had experienced diarrhea and bowel incontinence. She was to see a gastroenterologist. (Tr. 482).

In an undated post-operative letter to plaintiff's lawyer, Dr. Durer wrote that plaintiff "had a long history of endometriosis that caused quite a bit of pelvic pain for her."[4] (Tr. 556-57). Dr. Durer listed plaintiff's six surgical procedures between 2004 and 2008 and continued, "She did very well on depo-Lupron for one year sometime between all these surgeries. However, <u>treatment with Lupron is limited to one year</u>." (emphasis added). Dr. Durer noted that plaintiff had been contemplating a hysterectomy when she conceived in June 2008. After she delivered her child in February 2009, Dr. Durer told plaintiff that she could return to taking Lupron or could have a hysterectomy. Despite treatment with narcotics, plaintiff presented to the

---

[4]The ALJ states that this report was written in September 2009. (Tr. 56).

-10-

hospital in severe pain on June 24, 2009, and the hysterectomy was performed on June 30, 2009. After the surgery, plaintiff experienced some pain but complained more of diarrhea and incontinence of stool. On October 19, 2009, following plaintiff's hearing, Dr. Durer opined that plaintiff must lie down 2 to 3 hours a day due to migraines and chronic pelvic pain and would miss 4 to 14 days of work per month. (Tr. 557-58).

### III. The ALJ's Decision

In the decision issued on November 20, 2009, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act on October 31, 2007, the alleged date of onset, and remained insured through the date of the decision.

2. Plaintiff has not engaged in substantial gainful activity since October 31, 2007.

3. Plaintiff has the following severe impairment: endometriosis and is given the benefit of the doubt regarding the severity of migraine headache.

4. Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Since her alleged date of onset, plaintiff has had the residual functional capacity to perform the full range of medium work.

6. Plaintiff has been able to perform her past relevant work since her alleged date of onset.

7. Plaintiff has not been disabled as defined in the Social Security Act.

(Tr. 55-58).

### IV. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social

Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382a(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  <u>Nimick v. Secretary of Health and Human Servs.</u>, 887 F.2d 864, 868 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, she is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, she is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform her past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy.  If the claimant is not, she is

disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B. Plaintiff's Allegations of Error

Plaintiff contends that the ALJ (1) improperly assessed her residual functional capacity (RFC); (2) failed to properly develop the medical record; and (3) improperly assessed her credibility.

#### 1. The ALJ'S RFC Assessment

The ALJ determined that plaintiff has the RFC to perform the full range of medium work, without limitation. Plaintiff asserts that the ALJ improperly rejected her claim that she suffers from incontinence and failed to cite medical evidence to support his RFC determination.

The Social Security Administration has stated that "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

### Incontinence

An RFC determination is based on a claimant's impairments and <u>associated symptoms</u> that may cause mental and physical limitations that limit a claimant's ability to function in a workplace. 20 C.F.R. § 404.1545(a)(1) (emphasis added). The ALJ determined that plaintiff's incontinence did not rise to the level of an impairment, since it could not be established by objective medical evidence. (Tr. 55). Plaintiff does not claim that her incontinence is itself a severe disabling impairment, but a sequela of endometriosis and the related treatment that may be considered in determining her RFC.

Plaintiff testified that she experienced two to three bouts of bowel incontinence a day. Her testimony is supported by medical evidence. For instance, Dr. Durer's preoperative records identify bowel and bladder injury as risks associated with the procedure. And, in the course of the surgery, he noted a hemorrhagic peritoneal cyst adhered to the small bowel that required "meticulous" surgical work to remove. (Tr. 390-94; Tr. 492-94). The medical record ends shortly after plaintiff's hysterectomy in June 2009. However, in July 2009, plaintiff complained of symptoms, including diarrhea, caused by a pelvic hematoma for which she required inpatient treatment. On August 5, 2009, she complained of diarrhea and incontinence, a fact reflected in Dr. Durer's September 2009 opinion letter. Plaintiff's complaints that she suffers bowel incontinence are entirely consistent with the medical record and the ALJ erred by failing to consider its impact on her RFC. Because the incontinence developed shortly before the close of the medical record, the ALJ should consider whether to obtain consultative evaluations to determine its impact on plaintiff's RFC.

### Medium Work

The ALJ determined that plaintiff has the RFC to do the full-range of medium work. The ALJ erred by doing so, in that he cited no medical evidence that would support a finding that plaintiff can stand, walk or sit at levels required by medium level work. It is not clear what impact this error had on the ALJ's analysis, as he ultimately determined that plaintiff could return to her past relevant jobs which, according to the vocational expert, were classified as sedentary or light work. Nonetheless, on remand, the ALJ should support his RFC determination with appropriate citations to medical evidence.

### 2. Consultative Opinions

Plaintiff asserts that the ALJ by failing to obtain consultative evaluations regarding the impact of her incontinence and by substituting his own medical opinion. This issue has been addressed above.

### 3. The ALJ's Assessment of Plaintiff's Credibility

The ALJ determined that plaintiff's allegations of disabling pain were not credible. In doing so, he found that her claims were unsupported by medical evidence and inconsistent with her daily activities. He also rejected Dr. Durer's opinion as inconsistent with the treatment notes. The Court finds that the ALJ committed error with respect to each of these determinations.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). "In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions." Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000). A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of

objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)). The courts will defer to an ALJ's credibility finding if the ALJ "explicitly discredits a claimant's testimony and gives a good reason for doing so." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citation omitted).

Plaintiff testified that, as a result of her pain, she cannot stand for longer than 20 minutes at a time, walk for longer than 5 to 10 minutes at a time, sit for longer than 30 minutes at a time, or lift more than 15 pounds. She also alleges that she is disabled due to migraine headaches which are light- and sound-sensitive. The ALJ rejected plaintiff's testimony as unsupported by the medical record.

The ALJ first noted that plaintiff had multiple surgeries, including a hysterectomy in June 2009. (Tr. 56). The ALJ then stated: "Yet, in September 2009, [Dr.] Durer . . .reported that claimant did 'very well' on depo Lupron between surgeries and that she has only experienced 'some' pain since the hysterectomy." However, Dr. Durer also stated that depo Lupron cannot be taken for more than a year and that plaintiff had already reached that limit. The ALJ did not address the implications of this fact for plaintiff's pain management and her ability to work.

The ALJ also erred by failing to address the substantial evidence in the record that supported plaintiff's allegations of pain. On March 31, 2008, plaintiff was admitted to St. Luke's Hospital for intravenous pain control. The admitting physician noted that plaintiff appeared to be in distress and was curled up on the examination table. (Tr. 223). In February 2009, plaintiff was again hospitalized with abdominal pain that was relieved only with a morphine pump. (Tr. 406-09). Dr. Bartelsmeyer opined that plaintiff's pain was secondary to scarring. It is unclear from the record whether this scarring is subject to remediation. On June 28, 2009, Dr. Durer noted that plaintiff

was again experiencing pain that responded only to morphine and he expressed concern regarding pain control following her hysterectomy. (Tr. 390-94). Indeed, the record indicates that plaintiff continued to require oral narcotics after her hysterectomy. See Tr. 382 (listing plaintiff's medications on July 11, 2009, including Percocet). It is worth noting that no treatment provider ever opined that plaintiff was a malingerer or made exaggerated complaints of pain.

Plaintiff took Percocet throughout the years covered by this medical record. She testified that she experienced dizziness and fatigue. The ALJ discounted plaintiff's testimony because there was no evidence in the record that she complained to her physicians about side effects from Percocet. Dizziness and fatigue are among Percocet's possible side effects and the Court believes that the issue warrants further examination on remand.

The ALJ rejected plaintiff's testimony regarding her daily activities, noting that it contradicted her previously completed function report. However, between the time plaintiff completed the function report in May 2008 and the hearing in October 2009, plaintiff had a pregnancy and delivery, two inpatient admissions for treatment of pain, a hysterectomy, and a post-operative admission for treatment of an abdominal hematoma. On remand, it would be appropriate to re-examine plaintiff's daily activities.

In his assessment of plaintiff's credibility, the ALJ noted Dr. Durer's opinion that plaintiff would require rest breaks and absences at frequencies that preclude employment. The ALJ rejected Dr. Durer's opinion as inconsistent with his own notes and with the medical record as a whole. The ALJ did not specify the alleged

inconsistencies and none are apparent to the Court. Dr. Durer's opinion merits further consideration and if inconsistencies are present they should be identified.

Finally, the ALJ cited plaintiff's application for unemployment insurance benefits after she filed her application for disability benefits. Plaintiff testified that she applied for unemployment after her disability application was denied on initial consideration and that she was willing to try to work. An application for unemployment compensation is "some evidence, though not conclusive, to negate" a claim of disability. Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997). "However, the negative impact cannot be uniformly or automatically applied in every case. Where, as here, there is no other evidence to detract from the claimant's credibility, the negative inference is not sufficient, of itself, to negate the claimant's credibility." Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998). Plaintiff's work record indicates that she began working at age 17 and remained continuously employed until 2007. (Tr. 116-22). Her consistent employment history supports the credibility of her allegations. Hutsell v. Massanari, 259 F.3d 707, 713 (8th cir. 2001). On remand, the significance of plaintiff's application for unemployment benefits should be reassessed as part of the overall re-examination of plaintiff's credibility.

## V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of July, 2012.